## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

In Re:

TIMOTHY L. BRADSHAW,

      Debtor.

CASE NO:  06-11111

Chapter 7

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR RELIEF FROM AUTOMATIC STAY AND IN REPLY TO THE TRUSTEE'S RESPONSE AND OBJECTION TO PETITIONERS' MOTION

Petitioners Douglas R. Ivester, Jr. and Barbara C. Ivester (collectively, the "Petitioners" or "Mr. and Mrs. Ivester") respectfully submit this Memorandum of Law in Support of Petitioners' Motion for Relief from Automatic Stay and in Reply to the Trustee's Response and Objection to Petitioners' Motion.

## <u>MATTER BEFORE THE COURT</u>

In 2005, Mr. and Mrs. Ivester filed suit in the Superior Court of Davie County, North Carolina against numerous defendants, including Timothy L. Bradshaw ("Debtor" or "Mr. Bradshaw") and his company, Alternative Financial Concepts, L.L.C. ("AFC"), alleging claims for violation of the state securities laws, fraud, and fraudulent transfers arising out of a failed mobile billboard investment scheme. In January 2006, the Ivesters obtained partial summary judgment against Mr. Bradshaw and AFC on their first claim for relief for violation of state securities laws. Just prior to trial on the Ivesters' remaining claims, however, Mr. Bradshaw filed a bankruptcy petition under Chapter 7 of

US2000 9692453.3

the United States Bankruptcy Code. Because the Ivesters' action against Mr. Bradshaw and the other defendants is based exclusively on state law claims within the expertise of a nonbankruptcy forum, and allowing the litigation to proceed will promote judicial economy without unnecessarily interfering with the bankruptcy proceedings, the Ivesters have moved for, and are entitled to, relief from the automatic stay under 11 U.S.C. § 362. Petitioners' motion should therefore be granted and the trustee's objection denied.

## STATEMENT OF FACTS

Petitioners are retirees who were looking for financial assistance in safely investing retirement assets so as to have a secure retirement income. Mr. Bradshaw marketed himself as a financial advisor and "Certified Estate Adviser." Mr. Bradshaw is also president, sole member, and manager of AFC. Order Granting Mot. of Pls. for Partial Summ. J. as to Defs. Timothy L. Bradshaw and Alternative Financial Concepts, L.L.C., Findings of Fact ¶ 2 (attached as Ex. E to Pet'rs' Mot. for Relief from Automatic Stay) (hereinafter "Partial Summ. J. Order").

In the Spring of 2003, Barbara Ivester saw an advertisement placed by Mr. Bradshaw and AFC in "bizlife Magazine," which described an investment opportunity involving the sale and leaseback of mobile billboard units. Am. Compl. ¶ 74 (attached as Ex. A to Pet'rs' Mot. for Relief from Automatic Stay). Mr. Bradshaw marketed the investment as the Capital Appreciation Program ("CAP program"), representing it to be a stable investment providing a safe rate of return. *Id.* ¶ 73. As represented by Mr. Bradshaw, the CAP program consisted of the alleged purchase from Mobile Billboards of America, Inc. ("MBA") of mobile billboards capable of being mounted on trucks. Partial Summ. J. Order,

2

Findings of Fact ¶ 3. These billboards would then be leased to Outdoor Media Industries ("OMI"). *Id.* Investors could purchase a billboard frame for one side of the truck for $10,500, and billboard frames for two sides of a truck for $20,000. *Id.* The investment principal for this sale and leaseback scheme was represented to be "100 percent secured" through Reserve Guaranty Trust, and the investment supposedly returned a profit in the form of monthly lease payments from OMI. *Id.* ¶¶ 3-4.

Based on Mr. Bradshaw's representations, Mr. and Mrs. Ivester decided to invest their retirement savings in the CAP program. *Id.* ¶ 5. Mr. Bradshaw proceeded to serve as financial advisor to the Ivesters from 2003-04, during which time the Ivesters placed almost $1 million under his management, which he, in turn, invested in the CAP program. *Id.*

Despite Mr. Bradshaw's representations, however, the CAP program was in fact part of an illegal Ponzi scheme. Am. Compl. at 3. Investors' money was not used for the purchase and leasing of billboards, but instead investors such as the Ivesters received a "return" on their investment from either the principal of their own investment or through investments made by subsequent investors. *Id.* The CAP program also constituted the "offer" and "sale" of securities as defined in N.C. Gen. Stat. §§ 78A-2(8) and 78A-2(11). Partial Summ. J. Order, Conclusions of Law ¶¶ 3-4. However, the securities were not registered with the Securities Division of the Department of the Secretary of State prior to or at the time they were offered or sold to persons in North Carolina, including to Mr. and Mrs. Ivester, and were not otherwise exempt from registration. *Id.* ¶ 5. In addition, Mr. Bradshaw was not registered in North Carolina as a dealer or salesman of securities, as required by N.C. Gen. Stat. § 78A-36(a). *Id.* ¶ 7.

3

On April 2, 2004, the North Carolina Secretary of State entered a cease and desist order directing MBA, Mr. Bradshaw, AFC, and others to stop the offer and sale of the CAP program. Partial Summ. J. Order, Findings of Fact ¶ 6. Mr. Bradshaw was personally served with the cease and desist order on April 6, 2004.[1] *Id.* In September 2004, Mr. Bradshaw advised the Ivesters that the Securities and Exchange Commission ("SEC") and state regulatory agencies had raised questions regarding whether the CAP program should have been marketed as a security, and informed the Ivesters that MBA and OMI had ceased operations indefinitely and would not be making any further lease payments. Am. Compl. ¶ 109. After investing nearly $1 million in the CAP program, the total return received by Mr. and Mrs. Ivester from their monthly payments from OMI amounted to a mere $55,219.57. Partial Summ. J. Order, Findings of Fact ¶ 8. Mr. and Mrs. Ivester lost virtually all of their retirement savings as a result of the fraudulent and illegal mobile billboard investment scheme.

Within three months of the entry of the Secretary of State's cease and desist order against Mr. Bradshaw and AFC, and after the SEC began investigating the mobile billboard scheme, Mr. Bradshaw and his wife, Fredia Bradshaw, purchased a house located on Woods End Lane in Greensboro for a sales price of $520,000. Am. Compl. ¶ 111. The Debtor titled the property as tenancy by the entirety. *Id.* Out of the $520,000 sale price, $124,910.44 was paid with a check drawn on AFC's bank account. *Id.* ¶ 113.

---

[1] Despite being personally served with the cease and desist order on April 6, 2004, Mr. Bradshaw did not disclose the order to Mr. and Mrs. Ivester. In fact, Mr. Bradshaw sold the Ivesters $570,000 in purported mobile billboard units *after* being served with the cease and desist order. Partial Summ. J. Order, Findings of Fact ¶ 7.

4

Beginning in September 2003, Mr. Bradshaw caused AFC to transfer on a number of occasions substantial sums of money from AFC's bank account to various other bank accounts controlled by Mr. Bradshaw, his wife, or other entities controlled by Mr. Bradshaw, in order to protect these assets from creditors. These transfers included more than $90,000 transferred from AFC's bank account to the bank account of the Lyndsey Foundation, a special purpose trust organized by Mr. Bradshaw and his wife, who are the sole donors, creators, and trustees of the trust (Am. Compl. ¶ 119); $100,000 transferred from AFC's bank account to a brokerage account in Mr. Bradshaw's individual name, and from there to an account at American Partners Federal Credit Union in the sole name of Fredia Bradshaw (*id.* ¶¶ 120, 122); $134,500 transferred from AFC's bank account to PublishTown, L.L.C. ("PublishTown"), a limited liability company of which Mr. Bradshaw is the registered agent and sole member and manager (*id.* ¶ 128); and $425,000 transferred from AFC's bank account to a joint bank account in the name of Mr. Bradshaw and his wife (*id.* ¶ 132).

On February 10, 2005, Mr. and Mrs. Ivester filed suit against Mr. Bradshaw, AFC, and Fredia Bradshaw in the Superior Court of Davie County, North Carolina. On March 11, 2005, the Ivesters filed an Amended Complaint, adding Lyndsey Foundation and PublishTown as defendants. The Amended Complaint sets forth causes of action against the defendants for, *inter alia*, violation of the North Carolina securities laws, fraud, and fraudulent transfers.

Upon filing suit, Mr. and Mrs. Ivester sought to attach the fraudulently transferred property described above. On February 11, 2005, an order of attachment was issued and

levied upon, thereby attaching all of the personal property of Tim Bradshaw, Fredia Bradshaw, and AFC, including the joint bank account of Tim and Fredia Bradshaw. *See* Ex. B to Pet'rs' Mot. for Relief from Automatic Stay. The order of attachment also attached all real property of Tim Bradshaw, Fredia Bradshaw, and AFC. *Id.* The Guilford County Sheriff levied against the Woods End Lane property and a certificate of levy was entered on the lis pendens docket on October 21, 2005. *See* Ex. C to Pet'rs' Mot. for Relief from Automatic Stay. On March 11, 2005, an order of attachment was issued and levied upon, thereby attaching the property of Lyndsey Foundation and PublishTown. *See* Ex. D to Pet'rs' Mot. for Relief from Automatic Stay.

On December 1, 2005, the Ivesters moved for partial summary judgment against Mr. Bradshaw and AFC as to their first claim for relief, defendants' offering and sale of unregistered securities. After hearing argument, the Honorable Thomas W. Seay, Jr. granted the Ivesters' motion and entered an order on January 5, 2006, holding Mr. Bradshaw and AFC jointly and severally liable to the Ivesters for $915,280.43, plus interest, costs, and attorneys' fees, for their offering and sale to the Ivesters of unregistered securities. *See* Partial Summ. J. Order.

Trial on the Ivesters' remaining claims against Mr. Bradshaw, AFC, Fredia Bradshaw, Lyndsey Foundation, and PublishTown was originally scheduled for the October 2, 2006 session of the Superior Court of Davie County. On September 25, 2006, however, Mr. Bradshaw filed for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code. Although the automatic stay provision of 11 U.S.C. § 362(a) applied only to Mr. Bradshaw, and not the remaining defendants, the Ivesters were

concerned that, due to the nature of their fraudulent transfer claims and the orchestration by Mr. Bradshaw of the underlying acts giving rise to the liability of the other defendants, there might be reasonable disagreement as to the effect of Mr. Bradshaw's bankruptcy filing as to their claims against the remaining defendants. Thus, the Ivesters elected to postpone the trial to the next available trial session pending further clarification of the status of these claims.[2] On December 14, 2006, Mr. and Mrs. Ivester filed a Motion for Relief from Automatic Stay.

## QUESTION PRESENTED

Does good cause exist to grant Petitioners relief from the automatic stay pursuant to 11 U.S.C. § 362(d), where Petitioners' action involves issues of state law and allowing Petitioners to proceed with their action would promote judicial economy while not interfering with the bankruptcy proceedings?

## ARGUMENT

**I.     This Court Has Broad Discretion to Grant Relief from the Automatic Stay.**

Although Congress intended the automatic stay provision of 11 U.S.C. § 362(a) to have wide application, it also recognized that "the stay should be lifted in appropriate circumstances." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). Accordingly, Congress enacted 11 U.S.C. § 362(d)(1), which provides that "the court shall grant relief

---

[2] Trial on the Ivesters' remaining claims was set for the February 5, 2007 session of the Davie County Superior Court. However, on December 20, 2006, the Chapter 7 trustee removed the action to the United States District Court for the Middle District of North Carolina. A motion to transfer the removed action to this Court is currently pending, as are the Ivesters' motion to remand and motion for an expedited hearing to hear the motion to remand in this Court at the same time as the hearing on the Motion for Relief from Automatic Stay.

US2000 9692453.3

from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—for cause. . . ." This provision embodies Congress' understanding that:

> [I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

*Robbins*, 964 F.2d at 945 (quoting S. Rep. No. 989, at 50 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836).

In light of 11 U.S.C. § 362(d) and the policy considerations behind it, courts recognize that "Congress . . . has granted broad discretion to bankruptcy courts to lift the automatic stay to permit enforcement of rights against property of the estate." *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994). Despite this broad discretion, however, the Bankruptcy Code provides no definition as to what constitutes "cause" under 11 U.S.C. § 362(d)(1). Therefore, "courts must determine when discretionary relief is appropriate on a case-by-case basis." *Claughton*, 33 F.3d at 5; *see also In re Hogan*, No. 04-12336C-7G, 2004 WL 3510112, at *1 (M.D.N.C. Oct. 18, 2004). To determine whether sufficient "cause" exists to grant relief from the automatic stay, "[t]he court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Robbins*, 964 F.2d at 345. Courts in the Fourth Circuit consider the following factors in deciding whether to lift the automatic stay:

US2000 9692453.3

> (1) [W]hether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Robbins*, 964 F.2d at 345; *Hogan*, 2004 WL 3510112 at *2. For the reasons set forth below, each of these factors counsels in favor of lifting the automatic stay and allowing Petitioners to proceed with their action.

## II. Sufficient Cause Exists to Support Relief from the Automatic Stay.

### A. The Issues in the Pending Litigation Involve Only State Law, So the Expertise of the Bankruptcy Court Is Unnecessary.

The Ivesters' pending action against Mr. Bradshaw, AFC, and the other defendants involves North Carolina securities laws. This is an area over which North Carolina courts have a particular expertise, and does not require the expertise of the bankruptcy court. The remaining issues of fraud and fraudulent transfers also arise under state law. Thus, the first factor in the analysis weighs in favor of relief from the automatic stay.

### B. Allowing Petitioners to Proceed With the Pending Litigation Would Promote Judicial Economy, While Not Prejudicing the Bankruptcy Case.

#### 1. *Granting Relief from the Automatic Stay Promotes Judicial Economy.*

The second factor of the *Robbins* test is also met. The pending litigation against Mr. Bradshaw, AFC, and the other defendants has proceeded for nearly two years before the Superior Court of Davie County. Extensive discovery has been conducted, depositions have been taken, multiple motions have been filed, briefed, and determined,

and the Ivesters have already obtained partial summary judgment as to their first claim for relief for violation of the North Carolina securities laws. Mr. Bradshaw filed his bankruptcy petition just one week before the matter was originally scheduled for trial in state court. Trial was rescheduled for February 5, 2007, before the trustee removed the action to federal court. Pending the Ivesters' motion to remand, the state court has greater familiarity with the issues involved in this litigation and is much better positioned to resolve them in an expeditious manner.[3] Courts have implied that when discovery has been conducted and a matter is ready for trial, it is appropriate to grant relief from the automatic stay and allow the matter to proceed in state court. *Hogan*, 2004 WL 3510112 at *2. Thus, considerations of judicial economy support a granting of relief from the automatic stay.[4]

    2.    *Granting Relief from the Automatic Stay Will Not Prejudice the Bankruptcy Case.*

Granting relief from the automatic stay in order to allow the Ivesters to proceed with their action will not prejudice the bankruptcy case. Distilled to their essence, the trustee's only substantive arguments in opposition to the Ivesters' motion for relief from stay are that (i) in light of the Debtor's bankruptcy case, the Ivesters have no standing to

---

[3] Even if the Ivesters' motion to remand is denied and the removed action remains in federal court, the matter is ready for trial and, as discussed *infra*, determination of the issues involved will not prejudice the bankruptcy case. Therefore, relief from the automatic stay should still be granted even if the matter is not remanded to state court but remains in the United States District Court.

[4] In his response to Petitioners' Motion for Relief from Automatic Stay the trustee denies that the issues involved in the pending litigation can be more expeditiously resolved in state court and that relief from the automatic stay would promote judicial efficiency. Resp. & Objection to Mot. for Relief from Automatic Stay ¶ 27. The trustee, however, fails to offer any rationale for this blanket denial.

10

US2000 9692453.3

pursue the fraudulent transfer claims asserted in the state court litigation, and (ii) the trustee intends to pursue those claims for the benefit of all the Debtor's creditors.

As an initial proposition, these arguments in no way implicate whether the Ivesters should be permitted to further liquidate their claims against the Debtor and obtain a determination, pursuant to 11 U.S.C. § 523(a)(19), as to the dischargeability of such claims in the state court action. Moreover, even regarding the fraudulent transfer claims pending in the state court action, the trustee's arguments are without merit.

With respect to the standing issue, unlike the situation in the Fourth Circuit Court of Appeals cases cited by the trustee,[5] the transfers in question in this case were of non-debtor property – the property of AFC. AFC is not the subject of a bankruptcy case. As creditors of AFC, the Ivesters clearly have standing to pursue fraudulent transfer claims against fraudulent transferees of AFC's property such as the Lyndsey Foundation, Fredia Bradshaw, PublishTown, and a purported tenancy by the entirety between Fredia Bradshaw and the Debtor. These claims do not belong to the Debtor's estate.

a.    The Ivesters' Attachment of the Fraudulently Transferred Property Gives Them Priority Over the Trustee.

Moreover, even if the trustee had the power to avoid these transfers, it would not benefit the estate to do so, and the effort would be a waste of the estate's resources. *See In re Speir*, 190 B.R. 657, 659 (Bankr. N.D. Ala. 1995). This is so because the attachments obtained by Mr. and Mrs. Ivester on the fraudulently transferred real and personal property established the Ivesters' priority to these assets, which priority

---

[5] *Poth v. Russey*, 99 Fed. Appx. 446 (4th Cir. 2004); *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439 (4th Cir. 1999).

US2000 9692453.3

continues notwithstanding any bankruptcy proceeding.  First, because the Ivesters perfected their attachment liens more than 90 days prior to Mr. Bradshaw's bankruptcy filing, the Ivesters' attachment liens would not be subject to avoidance as preferential transfers under 11 U.S.C. § 547, even if the trustee could avoid the transfers to the fraudulent transferees.  The attachment liens will thus continue to encumber the property, even if the trustee proceeds with his stated intention (Resp. & Objection to Mot. for Relief from Automatic Stay at 4-5) to recover such property pursuant to 11 U.S.C. § 548.

Nor would the trustee be able to avoid the attachment liens on any other ground. The only other potential grounds for avoidance are the "strong-arm" provisions of 11 U.S.C. § 544.  However, despite the trustee's position to the contrary, 11 U.S.C. § 544 does not provide a basis by which he can avoid the Ivesters' attachment liens.

Pursuant to 11 U.S.C. § 544(a)(3), the trustee may avoid any transfer of real property of the Debtor that would be avoidable by a bona fide purchaser.  *See In re Suggs*, __ B.R. __, __, No. 05-51313, 2006 WL 2965790, at *2 (Bankr. M.D.N.C. Oct. 16, 2006).  Similarly, as to personal property of the Debtor, 11 U.S.C. §§ 544(a)(1) and (2) afford the trustee the status of a judgment lien creditor of the debtor on the date of the bankruptcy.  These are the provisions upon which the trustee relies in his objection to the Motion for Relief from Automatic Stay, where he quotes *Havee v. Belk*, 775 F.2d 1209, 1218 (4th Cir. 1985), for the proposition that § 544 "'gives the Trustee the status of a hypothetical lien creditor in attacking a transfer under a state fraudulent conveyance statute but, while it is the federal law which provides the Trustee with his 'strong-arm' power, his exercise of such power and its extent are governed entirely by the applicable

state law.'" However, the trustee omits the very next sentence of the *Havee* decision, in which the Fourth Circuit holds that § 544 "confers on the trustee 'no greater rights than those accorded by the applicable [state] law to a creditor holding a lien by legal or equitable proceedings.'" *Havee*, 775 F.2d at 1219 (quoting *Matter of Investors Funding Corp. of N.Y.*, 452 F. Supp. 771, 775 (S.D.N.Y. 1978)). Indeed, courts of the Fourth Circuit recognize that:

> [A] trustee, as a bona fide purchaser under § 544(a), is subject to all the constructive notice provisions of the state in which the trustee is attempting to assert his § 544 power. If there is such constructive notice as would preclude a bona fide purchaser from prevailing under state law, then the trustee cannot prevail under § 544(a)(3).

*Suggs*, 2006 WL 2965790 at *2 (quoting *In re Morgan*, 96 B.R. 615, 618 (Bankr. N.D.W. Va. 1989)).

This precedent is fatal to the Trustee's argument, for, under North Carolina law, a bona fide purchaser of real property takes subject to a previously perfected attachment recorded in the lis pendens docket. Likewise, a judgment lien creditor as to personal property takes subject to a previously perfected attachment of the same property. "When an order of attachment is perfected by a levy, a lien of attachment is created thereby which establishes the lienor's claim as against all other creditors and subsequent lienors." *Edwards v. Brown's Cabinets*, 63 N.C. App. 524, 528, 305 S.E.2d 765, 768, *review denied*, 309 N.C. 632, 308 S.E.2d 64 (1983). Thus, "[a] person claiming under a conveyance or encumbrance executed subsequent to the docketing of the notice of the order with respect to the property conveyed or encumbered takes subject to the action whose pendency was so noted." *Id.*; *see also Newberry v. Meadows Fertilizer Co.*, 203

US2000 9692453.3

N.C. 330, 338, 166 S.E. 79, 82 (1932) ("When the officer has served the warrant of attachment by . . . levying on the real estate of the defendant, and has complied with the provisions of the statute, . . . the plaintiffs have a lien on such property, which is enforceable against all subsequent purchasers from the defendant.").

Because the levy of attachment as to the Bradshaws' real property was recorded in the Guilford County lis pendens docket on October 21, 2005, the attachment has priority as to all subsequent bona fide purchasers for value, including the trustee. Likewise, because the orders of attachment were validly perfected as to the fraudulently transferred personal property, including the joint bank account in the name of Mr. and Mrs. Bradshaw, as well as to the bank accounts of Lyndsey Foundation and PublishTown, these attachments also have priority over all subsequent judgment lien creditors, including the trustee.

The above principles are best illustrated by several recent bankruptcy decisions dealing with the analogous situation of the filing of a notice of lis pendens. In *Suggs*, *supra*, a creditor moved for relief from the stay as to certain real property as to which it had filed a notice of lis pendens prior to the debtor's bankruptcy filing. The United States District Court for the Middle District of North Carolina held that under North Carolina law, a bona fide purchaser "must be able to show that he had no constructive notice by reason of lis pendens of pending litigation affecting title to the property." 2006 WL 2965790 at *3. Thus, "a subsequent bona fide purchaser or lien creditor will take the property subject to a properly recorded notice of lis pendens." *Id.* The filed lis pendens provided constructive notice of the pending litigation over the property, and therefore

14

precluded the trustee from exercising his powers under § 544(a)(3) to include the property in the bankruptcy estate. *Id.* Furthermore, the filing of the lis pendens before the bankruptcy petition established the creditor's priority over the trustee's claims as a hypothetical lien creditor under § 544(a)(1). *Id.* Thus, any judgment lien obtained by the trustee as a hypothetical lien creditor under § 544 was also subordinate to the creditor's lien. *Id.*

*In re Medlin*, 229 B.R. 353 (Bankr. E.D.N.C. 1998), demonstrates that the same rule applies to fraudulently transferred property recovered by a trustee as representative of a bankruptcy estate. There, the trustee brought an adversary proceeding to determine the validity and priority of a judgment lien asserted by a creditor against property that had been fraudulently transferred by the husband and wife debtors and subsequently recovered by the trustee for the bankruptcy estate. A creditor of the debtors had recorded a notice of lis pendens against the property in question after the property was fraudulently conveyed but more than 90 days before bankruptcy. The court concluded that a lis pendens "fixes the priority of the lien that arises when the order of attachment is subsequently perfected by judgment and levy" and, therefore, "a subsequent bona fide purchaser or lien creditor takes the property subject to a properly recorded notice of lis pendens." *Id.* at 358. The creditor's notice of lis pendens was in fact filed eleven months before the bankruptcy petition, and established the priority of the creditor's claim against subsequent lienors or bona fide purchasers, "since any lien obtained by [the creditor] would relate back to the filing of the lis pendens." *Id.* Indeed, while the creditor had in fact obtained a judgment against the debtors by the time of the bankruptcy petition, the

US2000 9692453.3

court noted that even if the creditor had held "only the unavoidable lis pendens on the petition date, it would be free to seek relief from the automatic stay, obtain judgment, and execute upon any resulting lien." *Id.* at 358 n.2.

Just like the notices of lis pendens in the cases discussed above, the certificate of levy here was entered in the judgment index and afforded constructive notice of the Ivesters' attachment. Thus, even if the trustee were able to recover the real property for the estate, because a bona fide purchaser of the real property on the date of bankruptcy would take subject to the Ivesters' attachment lien, the trustee would not be able to avoid the attachment lien pursuant to his "strong arm" power under 11 U.S.C. § 544(a), and the real property would come into the estate encumbered by the attachment lien. Similarly, because a judgment lien creditor levying on the bank accounts on the date of bankruptcy would be subordinate to the Ivesters' attachment lien under North Carolina law, the trustee would likewise be unable to avoid the attachment lien pursuant to his "strong arm" powers under 11 U.S.C. § 544(a), and the funds in the bank accounts would come into the estate encumbered by the attachment lien.

The priority established by the Ivesters' attachments also belies the trustee's reliance on *Poth v. Russey*, 99 Fed. Appx. 446 (4th Cir. 2004), and *National American Insurance Co. v. Ruppert Landscaping Co.*, 187 F.3d 439 (4th Cir. 1999), for the proposition that the trustee alone has standing to avoid the fraudulent transfers for the benefit of the estate. In *Speir*, *supra*, a creditor had previously obtained a judgment lien against the debtor and sought to avoid the debtor's fraudulent transfer of property to his wife. 190 B.R. at 659-60. The creditor challenged a proposed bankruptcy settlement

16

US2000 9692453.3

based on the settlement's disposition of the fraudulently transferred property. *Id.* at 660. In opposition to the creditor's objection, the trustee, like the trustee here, asserted that he alone had standing to seek avoidance of the fraudulent transfer on behalf of the estate. *Id.* However, the court rejected this argument, due to the fact that under state law the creditor had rights superior to the trustee and, therefore, "the Trustee has no tangible interest in this property." *Id.* at 661.

In support of his position, the trustee in *Speir* cited cases similar to *Poth* and *Ruppert Landscaping* for the proposition that "a fraudulent transfer vest[s] in a bankruptcy trustee on the date of the filing of the bankruptcy and . . . the future of the suit to avoid the transfer [is] within the control of the bankruptcy court." *Id.* at 664. However, the court noted that none of the cases cited by the trustee involved a creditor with superior rights to the trustee under state law. *See id.* Moreover, "[i]n those cases the trustees had interests that could benefit the estates. Here there is no such interest." *Id.* Indeed, while "'in general a creditor of a bankrupt cannot after bankruptcy maintain an action to set aside a fraudulent conveyance made by the bankrupt, and . . . the . . . trustee . . . alone may do so,'" a different rule obtains when the creditor has a lien which gives him rights to the property superior to the trustee under state law. *Id.* at 661-62 (quoting *Rowe v. Bonneau-Jeter Hardware Co.*, 245 Ala. 326, 330, 16 So. 2d 689 (1944)). Because the trustee had no tangible interest in the property at issue, the court refused to approve the settlement. *Id.* at 659.

Here, as in *Speir*, the cases relied upon by the trustee did not involve a creditor with rights in the property superior to the trustee under state law. The Ivesters'

US2000 9692453.3

attachments give them priority to the fraudulently transferred property under North Carolina law and are "superior to any interest the Trustee obtained at the time the bankruptcy was filed, thus precluding the Trustee from realizing any tangible benefit." 190 B.R. at 663. Because the Ivesters' attachment liens would survive any recovery by the trustee of the fraudulently transferred property, the trustee has no tangible interest in the property, and the granting to the Ivesters of relief from the automatic stay will not prejudice the bankruptcy case. Simply put, "[w]ith or without the stay, creditors' interests remain the same." *In re Huffman*, 989 F.2d 493, 1993 WL 83359, at *2 (4th Cir. Mar. 24, 1993) (unpublished).

> b. Concurrent Jurisdiction Exists Over the Dischargeability Determination.

In addition to the priority of the Ivesters' attachments, the bankruptcy case will suffer no prejudice from the lifting of the stay because the state court (or other nonbankruptcy forum) has concurrent jurisdiction over the claim made by the Ivesters that Mr. Bradshaw's debts to them are non-dischargeable. Pursuant to 11 U.S.C. § 523(a)(19), a debtor is not discharged from any debt that is for "the violation . . . of the State securities laws . . . ; or common law fraud, deceit, or manipulation in connection with the purchase or sale of any security" and results from "any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor."[6] Under 11 U.S.C. §

---

[6] The partial summary judgment obtained by Mr. and Mrs. Ivester as to their claim for violation of the North Carolina securities laws constitutes a "court or administrative

523(c), the federal bankruptcy court has exclusive jurisdiction over claims for non-dischargeability made pursuant to 11 U.S.C. § 523(a)(2), (4), or (6). However, state courts and other "'appropriate nonbankruptcy for[a]'" have concurrent jurisdiction over issues of dischargeability related to all other subsections of 11 U.S.C. § 523(a). *Long v. Long*, 102 N.C. App. 18, 23, 401 S.E.2d 401, 403-04 (1991). One such subsection is 11 U.S.C. § 523(a)(19), which "expressly contemplates a postpetition determination of liability by a nonbankruptcy forum for debts resulting from securities law violations as well as common law fraud, deceit, or manipulation in connection with the purchase or sale of a security." *In re Zimmerman*, 341 B.R. 77, 80 (Bankr. N.D. Ga. 2006). Therefore, "creditors asserting a debt of this nature have the right to pursue their claims under nonbankruptcy law in other courts, notwithstanding the bankruptcy filing." *Id.* In light of the concurrent jurisdiction of the state court or other nonbankruptcy forum, adjudication of a claim of nondischargeability made by the Ivesters pursuant to 11 U.S.C. § 523(a)(19) will not interfere with the bankruptcy proceedings.[7]

---

order" pursuant to 11 U.S.C. § 523(a)(19)(B)(iii). *See In re Civiello*, 348 B.R. 459, 465-66 (Bankr. N.D. Ohio 2006).

[7] In *Zimmerman*, the court modified the stay to permit the plaintiffs to liquidate their claims through arbitration but maintained the stay with respect to the determination of dischargeability because the plaintiffs had filed an adversary proceeding seeking determination of dischargeability by the bankruptcy court. 341 B.R. at 81 ("The Plaintiffs have invoked the jurisdiction of this Court to determine the dischargeability of debts under § 523(a)(19) as well as under § 523(a)(2), (4), and (6)."). In contrast, the Ivesters have not invoked the jurisdiction of this Court to determine the issue of dischargeability.

US2000 9692453.3

C.  <u>The Bankruptcy Estate Can Be Properly Protected By Requiring that Mr. and Mrs. Ivester Seek Enforcement of Any Judgment Against Property of the Estate Through the Bankruptcy Court.</u>

Finally, the Debtor's estate can be properly protected in this case by requiring Mr. and Mrs. Ivester to seek enforcement of any judgment in the pending litigation against property of the estate through the bankruptcy court. Thus, for example, to the extent fraudulently transferred property was jointly held by the Debtor and Fredia Bradshaw as of the date of the Debtor's bankruptcy filing, the stay could be maintained in effect on account of Mr. Bradshaw's purported interest therein pending a determination of the relative rights therein between the Ivesters and the Debtor's estate. Accordingly, the third factor in the *Robbins* test also favors the granting of relief from the automatic stay.

<u>**CONCLUSION**</u>

For the foregoing reasons, Petitioners' Motion for Relief from Automatic Stay should be granted.

This the 8th day of January, 2007.

<u>/s/ James J. Hefferan, Jr.</u>
David C. Smith (State Bar #12558)
E-mail: DCSmith@KilpatrickStockton.com
Tonya R. Deem (State Bar #23075)
E-mail: TDeem@KilpatrickStockton.com
James J. Hefferan, Jr. (State Bar #31579)
E-mail: JHefferan@KilpatrickStockton.com

*Attorneys for Petitioners, Douglas R. Ivester, Jr.
and Barbara C. Ivester*

KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300
Facsimile: (336) 607-7500

US2000 9692453.3

# CERTIFICATE OF SERVICE

This is to certify that on this date the undersigned, attorney for Petitioners electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR RELIEF FROM AUTOMATIC STAY AND IN REPLY TO THE TRUSTEE'S RESPONSE AND OBJECTION TO PETITIONERS' MOTION** using the CM/ECF system which will send notification of such filing to the following:

Gerald S. Schafer, Esq.       Michael D. West
220 Commerce Place        Bankruptcy Administrator
Greensboro, NC  27401       P.O. Box 1828
geraldatty@bellsouth.net       Greensboro, NC  27402
*Attorney for Debtor*

William P. Miller, Esq.
Roberson Haworth & Reese, PLLC
300 N. Main Street, Ste. 300
P.O. Box 1550
High Point, NC  27261
wpmtrustee@rhrlaw.com
*United States Trustee*

I hereby certify that I have served the document to the following non CM/ECF participants by depositing a copy thereof in the United States mail, postage prepaid and addressed as follows:

Timothy L. Bradshaw        Fredia Nixon Bradshaw
2606 Woods End Lane        2606 Woods End Lane
Greensboro, NC  27410       Greensboro, NC 27410
*Debtor*

Alternative Financial Concepts, L.L.C. by  PublishTown, L.L.C.
serving its registered agent, Timothy L.   by serving its registered agent, Timothy L.
Bradshaw            Bradshaw
2606 Woods End Lane        2606 Woods End Lane
Greensboro, NC 27410       Greensboro, NC  27410

Lyndsey Foundation
by serving ts registered agent, Timothy L.
Bradshaw
2606 Woods End Lane
Greensboro, NC  27410

21

US2000 9692453.3

This the 8th day of January, 2007.

/s/ James J. Hefferan, Jr.
James J. Hefferan, Jr.
*Attorney for Petitioners*

KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
Telephone: (336) 607-7300

22

US2000 9692453.3